*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
July 18, 2024

*In re* D. CHAMBERLAIN, Minor.

No. 367684
Calhoun Circuit Court
Family Division
LC No. 2022-001647-NA

Before: RIORDAN, P.J., and RICK and N. P. HOOD, JJ.

PER CURIAM.

Respondent appeals as of right the order terminating his parental rights to the minor child, DC. Respondent is DC's grandfather. He and his wife, who is now deceased, legally adopted DC after DC's biological mother's parental rights were terminated.[1] Accordingly, respondent will be referred to as "grandfather." The court found that statutory grounds existed to support terminating grandfather's parental rights under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), (3)(j) (reasonable likelihood that child will be harmed if returned to parent), and subsequently concluded that termination was in DC's best interests. We affirm.

## I. FACTUAL BACKGROUND

Grandfather and his late wife were the legally adoptive parents of DC and two of his siblings, AM and KM. Grandfather and his wife were also the legal guardians of JC, who is a half-sibling of DC, AM, and KM. Petitioner, the Department of Health and Human Services (DHHS), filed a petition in this matter on June 17, 2022. The petition alleged that grandfather physically abused KM in October 2021 by grabbing her arm, which resulted in Children's Protective Services (CPS) opening an ongoing investigation into allegations of abuse and neglect. In March 2022, grandfather again came into contact with CPS after it was determined that DC had never had a well-child medical examination and that he, AM, and KM were all suffering from numerous dental cavities. Also in March 2022, KM reported that grandfather would sometimes go to the hospital

---

[1] The record gives no information regarding DC's biological father.

for medical treatment and leave the children at home for days without supervision. In May 2022, grandfather got into an altercation with AM in which he shoved AM onto a bed and put a hand over his mouth. Following the incident, grandfather stated that he wanted the children removed from the home. A similar incident was reported to CPS in June 2022, in which grandfather got into another altercation with AM, grabbed him, shoved him onto a bed, and attempted to choke him.

Prior to the filing of the petition, CPS referred grandfather to multiple services. Grandfather generally declined to participate in any of the services offered. Over the course of the CPS investigation, it was determined that grandfather suffered from a number of ailments, including memory loss and addiction to pain medication. The petition indicated that grandfather could not care for himself or the children—including the tasks of bathing, dressing, cooking, and cleaning for himself or the children—without assistance. Grandfather himself admitted that he "[could] not care for the children due to his medical issues." Eventually, grandfather was admitted to an inpatient rehabilitation facility for an indeterminate amount of time, leaving the children without a custodian. DHHS therefore asked the trial court to remove the children from grandfather's care. DHHS further requested that the court dissolve grandfather's guardianship of JC.

Two preliminary hearings were held in June 2022. Grandfather did not appear at either hearing. The court declined to authorize the petition until grandfather had an opportunity to appear, but placed the children in DHHS's temporary custody.[2] Two additional preliminary hearings were held in July 2022, at which grandfather again failed to appear. At the second of those hearings, grandfather's counsel explained that she spoke with him, advised him that the hearing was taking place, and asked him whether he would like to stipulate to the allegations in the petition for the purpose of establishing probable cause. Grandfather declined to stipulate. The trial court found that grandfather had been given adequate notice of the hearing. After hearing testimony from a CPS worker involved in the case, the court elected to authorize the petition.

An adjudication and disposition hearing was held in August 2022. Grandfather again failed to appear. The court found that notice was given and that grandfather had waived his right to appear and be heard at the hearing. A CPS worker testified as to the allegations in the petition, and stated that services were offered to grandfather, but his participation was minimal until he agreed to go into an inpatient rehabilitation facility. She noted that DHHS had considered a number of different custody options, including placing the children under guardianship, but could not find a suitable long-term arrangement for the children. The worker believed that grandfather no longer wanted the children in his home. She stated that he suffered from memory loss and could not care for himself. After hearing the testimony, the court exercised jurisdiction over the children due to "substantial risk of harm, the mental well-being, lack of proper custody or

---

[2] At the second preliminary hearing, the court terminated the guardianship as to JC and reopened JC's child protective proceedings case. Thus, the child protective proceedings involving JC no longer pertained to grandfather's parental rights, and instead pertained to the rights of JC's biological parents. JC was no longer involved in the instant proceedings after the guardianship was terminated.

guardianship and unfit home or environment[.]" The court then turned to the dispositional phase of the proceedings, and concluded that setting a goal of reunifying the children with grandfather was appropriate at that time. Grandfather was ordered to comply with a case service plan.

At a permanency planning review hearing in February 2023, a foster care caseworker testified that DHHS wished to modify the goal of reunification with grandfather. She indicated that DHHS now sought to place AM and KM under guardianship and to terminate grandfather's parental rights to DC. The worker testified that several services were offered to grandfather through CPS before the children were removed, including inpatient rehabilitation and in-home assistance. Multiple services were also offered after the children were removed, including parenting classes, supportive visitation and education classes, and individual counseling. Grandfather did not attend the parenting classes, attended four of seven scheduled in-home supportive visitation meetings, and sporadically attended individual counseling, at which point the counselor closed grandfather's file. The worker agreed that transportation appeared to be an issue for grandfather and that he was slightly more likely to participate in services that were home-based. Grandfather had been in and out of a psychiatric facility and had been released to an adult foster care (AFC) home. No discharge date had been given for when grandfather would be able to leave the AFC facility.

Drug use also posed a concern for DHHS. According to the foster worker, grandfather tested positive for methamphetamine and trace amounts of ecstasy in December 2022, after the children had been removed from the home. Additionally, grandfather was allowing his daughter to live with him, despite the fact that his daughter is the biological mother of DC and his siblings, and had her parental rights to the children terminated in an earlier proceeding. The worker stated that allowing mother in the home would render it an unfit environment for the children. One of the reasons that mother's rights were terminated was persistent drug use. The worker expressed concern over the fact that grandfather was now testing positive for substances after allowing mother to live with him. On cross-examination, the worker also explained that mother had been stealing items from grandfather's home while he was hospitalized.

The worker stated that guardianship was appropriate for AM and KM because both children were nearing the age of eighteen and thus would not be under guardianship for more than a few years. However, DC was only three years old at the time. The worker explained that given DC's young age, DHHS believed that guardianship would not be appropriate. The foster care worker opined that a strong bond did not exist between grandfather and the older two children, but that a "[t]ypical grandfather, grandson type relationship" existed between grandfather and DC. At the close of proofs, the trial court ordered DHHS to file a supplemental petition for termination in relation to DC and a separate petition for guardianship of AM and KM.

DHHS subsequently filed a supplemental petition for termination of grandfather's parental rights to DC. The termination hearing began in June 2023. Two foster care caseworkers testified. The first attested that grandfather's participation in services was sporadic, but agreed that he shared a bond with DC. When asked why guardianship was not considered for DC, she explained that guardianship was not considered a good fit because of DC's young age. The second caseworker testified that grandfather remained in need of mental health treatment and could not care for himself without assistance. Grandfather intended for DC's mother to come live with him, which the worker found inappropriate since mother had her rights to DC terminated. The worker went

-3-

on to explain that grandfather completed a psychological evaluation, during which it was determined that he was suffering from the early stages of dementia. The second caseworker testified that she did not believe that grandfather had the cognitive ability to benefit from further reunification services. She agreed that grandfather and DC shared a bond, but characterized it as "more of a child/friend bond than a child/parent bond." She indicated that the guardian selected for AM and KM had agreed to adopt DC so that the siblings could remain together.

In early August 2023, grandfather's psychological evaluation was submitted to the court. Dr. Randall Haugen, the evaluating psychologist, stated in the evaluation that grandfather should not remain DC's primary caretaker. Dr. Haugen opined that grandfather was "at-risk for patterns of abuse/neglect . . . . relate[d] to a high degree of emotional distress and personal adjustment problems." Dr. Haugen also noted that grandfather suffered from "cognitive deficits that are likely related to [a] history of cerebral vascular accidents." He recommended that grandfather "play a collateral role in parenting his grandson."

The termination hearing resumed the following week. Grandfather testified that he remained in an AFC home and would continue to do so until a doctor approved his request to leave the facility. He further stated that his daughter—DC's biological mother—was helping him to get his house cleaned up after it was broken into. He stated that he would not be able to care for DC on his own until his living situation was in order. When asked about the psychological evaluation, grandfather stated that he disagreed with the overall prognosis, but agreed that it would take some time before he would be ready to parent DC on his own. When asked whether he would abide by a court order stating that DC's biological mother could not live with him and DC, grandfather refused because he believed that mother was sober and stable.

The trial court made its statutory-basis and best-interest rulings on the third day of the termination hearing. The court found that statutory grounds for termination existed under MCL 712A.19b(3)(c)(i) and (3)(j), and found that termination was in DC's best interests. This appeal followed.

## II. ANALYSIS

## A. REASONABLE EFFORTS

Grandfather argues that his parental rights to DC were erroneously terminated where DHHS failed to make reasonable efforts to accommodate his cognitive issues. We disagree.

In general, this Court reviews for clear error a "trial court's factual finding that petitioner made reasonable efforts to reunify" parent and child. *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). However, the record does not indicate that grandfather objected to the services provided by DHHS or that he requested different services that DHHS failed to provide. A request for accommodations "must be raised in a timely manner," typically either when a case service plan is ordered or soon after. *In re Terry*, 240 Mich App 14, 26; 610 NW2d 563 (2000). Grandfather did not object to the accommodations offered or request different accommodations at any point during the proceedings below. Therefore, the issue is unpreserved, and our review is for plain error affecting grandfather's substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the

outcome of the proceedings." *Id*. at 9. "When plain error has occurred, '[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence.' " *Id*. (citation omitted).

In general, termination is improper without a finding that DHHS has made reasonable efforts to reunify parent and child. *In re Hicks/Brown*, 500 Mich 79, 90; 893 NW2d 637 (2017). The trial court must order reasonable efforts toward reunification, with the only exception being cases involving aggravated circumstances. See MCL 712A.19a(2); *Hicks/Brown*, 500 Mich at 90. DHHS is required to "create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Hicks/Brown*, 500 Mich at 85-86.

However, although DHHS must provide reunification services, "there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *Atchley*, 341 Mich App at 339 (quotation marks and citation omitted). A parent who challenges the reasonable efforts made by DHHS must show that they would have benefited more had other services been provided, and must identify the services that should have been offered to accommodate their needs. *In re Sanborn*, 337 Mich App 252, 266; 976 NW2d 44 (2021). Additionally, DHHS has a specific duty under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., to modify services in order to prevent discrimination based on a "known or suspected intellectual, cognitive, or developmental impairment." *Sanborn*, 337 Mich App at 263.

The record indicates that grandfather was offered services before and after the filing of the initial petition in this matter, including supportive foster care visitation services, which contained an educational component; traditional parenting time; additional parenting education classes; individual counseling; a psychiatric evaluation; inpatient rehabilitation; in-home family support services; and pre-paid gas cards for transportation. Grandfather's participation in services was sporadic at best. At the termination hearing, a foster care caseworker testified that she knew grandfather had memory issues and was prone to forgetting appointments. The trial court specifically asked whether reasonable accommodations were being provided to combat grandfather's memory and cognitive issues. The worker testified that she personally transported grandfather to and from parenting time, gave him printed calendars with important dates, and would call him to remind him about meetings. The court then asked whether grandfather had requested any other accommodations, to which the worker responded, "No."

Based on the testimony provided at the hearing, it appears that DHHS was aware that grandfather had cognitive issues that caused memory loss. Along with providing a broad range of services to grandfather, DHHS clearly attempted to provide accommodations for his cognitive and memory issues by providing him with telephone reminders, transportation to and from meetings, and printed calendars to help him remember important dates. Grandfather has not identified any specific services that would have better served to accommodate his cognitive issues, nor does he explain why the services provided were insufficient or inappropriate. See *Sanborn*, 337 Mich App at 266. We thus conclude that DHHS made reasonable efforts toward the goal of reunification and that reasonable accommodations were offered in compliance with DHHS's responsibilities under MCL 712A.19a(2) and the ADA. Accordingly, grandfather has not demonstrated that the trial court committed plain error affecting his substantial rights.

## B. GUARDIANSHIP

Grandfather next argues that the trial court erred by declining to place DC under guardianship. We disagree.

Once statutory grounds for termination are established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When evaluating whether termination is in a child's best interests, "[t]he trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (citation omitted). Factors to be considered in making the determination include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. (quotation marks and citation omitted). The trial court may also consider the child's well-being while in care and the possibility of adoption. *Id*. at 714. At the best-interests stage, the court's focus must be on the child and not the parent. *Moss,* 301 Mich App at 87.

In making its best-interest ruling, the trial court stated, in relevant part:

> [DC] has two siblings currently in the placement that he's in, they are in guardianship and the argument is how come they can't—how come [DC] can't be in guardianship. Well, the siblings are—are almost of adult age, so they would be a very short period of time in guardianship and they're of an age where due consideration would be given to their wishes in this matter. [DC] on the other hand, is very young, considering the fact that based upon what the Court sees, the grandfather will never be able to care for this child, there's no indication that there is a relationship between the current caregiver and the grandfather, as such that this is this is a situation where the children could continue, in fact, the testimony is that [AM] and [KM] are not even seeing the grandfather, it was there was no testimony as to why, but it's clear that's not happening and those children are also placed with the current custodian.
>
> * * *
>
> While I understand that this is gonna [sic] be severely painful to the grandfather, I have to look at what's best for [DC] and in this matter . . . what is best for [DC] is to allow him to be in a loving, caring home where he can have his medical needs met, where he is properly supervised, where he has someone that can

-6-

care for him, where he's not at risk of having contact with someone who previously abused him and had their rights terminated, which the grandfather clearly indicated he thought was gonna [sic] be okay . . . . [DC] is in a—a loving, appropriate home and because of that guardianship, again is not appropriate because there is no length of time considering the child's age . . . a[n] 11-year or 16-year guardianship for [DC] is—is simply not acceptable.

Generally, "guardianships are one of a few options available to a court when it determines that termination of parental rights is *not* in the best interests of the minor child." *In re Prepodnik*, 337 Mich App 238, 243; 975 NW2d 66 (2021). "[F]or a court to consider a guardianship before termination, one of two conditions must be met: either the DHHS must demonstrate 'under [MCL 712A.19a(8)] that initiating the termination of parental rights to the child is clearly not in the child's best interests' or the court must 'not order the agency to initiate termination' proceedings under MCL 712A.19a(8)." *In re Rippy*, 330 Mich App 350, 359; 948 NW2d 131 (2019), quoting MCL 712A.19a(9). But even if one of these conditions is met, guardianship is only appropriate if the court determines that such an arrangement is in the child's best interests. MCL 712A.19a(9)(c). Neither of the conditions precedent for establishing a guardianship under MCL 712A.19a(9) was met here, and the trial court found that the termination of grandfather's parental rights was in DC's best interests.

Grandfather maintains that it would have been appropriate for the court to place DC under guardianship in the same home where DC's siblings, AM and KM, were already under guardianship. DC was three years old when grandfather's parental rights were terminated, whereas AM was 17 years old and KM was 16 years old. The trial court declined to consider a guardianship, noting that given DC's young age, he could potentially be in a guardianship arrangement for many years. Grandfather points to no authority indicating that youth should not be considered a factor in determining whether to establish a guardianship. Additionally, youth was only one factor considered by the court in its best-interest analysis.[3] The trial court also noted that termination was appropriate because it was the best option for granting DC permanence and stability, adequate care and supervision, and the ability to remain with his siblings. The court further voiced concern that grandfather may let DC's biological mother live with DC. Thus, the court's rationale was thorough, and its decision not to establish a guardianship was not based solely on DC's young age.

While grandfather should be commended for stepping up to be DC's legal father, the court was correct to focus on DC's best interests in this matter. See *Moss,* 301 Mich App at 87. Grandfather has unresolved cognitive and mental health issues, including memory loss. These types of issues are an unfortunate part of the aging process and likely will not improve over time.

---

[3] In *In re Timon*, 501 Mich 867; 901 NW2d 398 (2017), our Supreme Court remanded a case for reconsideration of whether termination was in the child's best interests. In doing so, the Court directed the trial court to "make an individualized determination as to whether terminating respondent's parental rights is in the best interest of respondent's youngest child without regard to a generalized policy disfavoring guardianship for children under the age of 14." *Id.* From this language, it is apparent that the trial court must not decline to consider guardianship solely based on a child's age or on a blanket DHHS policy disfavoring guardianships for young children.

Even with reasonable accommodations for said problems, grandfather failed to benefit from services provided by DHHS, and did not show any marked improvement in his ability to parent DC. Grandfather did not believe his cognitive issues posed a challenge to his parenting ability, but he was still living in an AFC home when the termination hearing took place. Further, grandfather admitted that it would take him some time to make his home appropriate for DC after it was ransacked. Evidence presented on the first day of the hearing indicated that the home was destroyed and items stolen from inside by his daughter, DC's biological mother. Troublingly, grandfather agreed that he would not necessarily bar mother from the home, even if ordered to do so by the court. Instead, he stated that he planned to allow mother to live with him and DC if DC were returned to his care. None of this evidence suggests that grandfather is capable of providing permanency, stability, and finality to DC in a reasonable amount of time. On this record, we conclude that the trial court properly took into consideration all of the available evidence and options, including adoption and guardianship, and did not err by finding that termination of grandfather's parental rights was in DC's best interests.

Affirmed.

/s/ Michael J. Riordan
/s/ Michelle M. Rick
/s/ Noah P. Hood